HUGHES AIRCRAFT CO.

v.

The UNITED STATES.

No. 426–73.

United States Court of Claims.

April 14, 1976.

Kingdom (U.K.) in a joint defense satellite communications program (Skynet II), requires us to decide four questions which concern this court's patent and general jurisdiction. These questions are:

(1) Whether the use or manufacture of plaintiff's patented invention, purportedly on behalf of the U.K. Government, constituted a use or manufacture "by or for the United States" sufficient to vest jurisdiction in this court under 28 U.S.C. § 1498(a);

(2) whether plaintiff's claim "grows out of" or is "dependent upon" the 1970 Memorandum of Understanding[2] between the U.S. and the U.K. so as to preclude this court's jurisdiction by virtue of 28 U.S.C. § 1502;

(3) whether the Skynet II program, insofar as U.S. expenses thereunder were to be fully reimbursed by the U.K., was a non-appropriated fund activity as to which this court lacks jurisdiction by virtue of 28 U.S.C. § 2517; and

(4) whether the omission from the 1968 Foreign Military Sales Act (FMSA), 22 U.S.C. §§ 2751–94 of the special patent infringement jurisdictional provision contained in predecessor statutes manifests congressional intent to eliminate this court's jurisdiction over claims arising from the Government's foreign military sales activities.

Dugald S. McDougall, Chicago, Ill., attorney of record, for plaintiff; John E. Benoit, Arlington, Va., of counsel.

Irving Jaffe, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant; James D. Stokes, Jr., and Barry Estrin, Washington, D. C., of counsel.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and KUNZIG, Judge.

## ON DEFENDANT'S MOTION FOR PARTIAL DISMISSAL

COWEN, Chief Judge:

This case, involving the alleged infringement of plaintiff's patent[1] pursuant to the Government's participation with the United

■ In addition to the instant suit, instituted on November 13, 1973, plaintiff on January 17, 1974, also commenced an action for infringement of the same patent[3]

1. United States Letters Patent No. 3,758,051, entitled "Velocity Control and Orientation of a Spin-Stabilized Body," issued to plaintiff, Hughes Aircraft Co., on September 11, 1973, as assignee of the inventor and former Hughes employee, Donald D. Williams. There is no question that Hughes, as assignee of the accused patent, is the proper party in interest. *Wing Eng'r Corp. v. United States*, 151 F.Supp. 314, 138 Ct.Cl. 260 (1957).

2. Memorandum of Understanding Concerning Continued Cooperation in Defense Satellite Communications with Her Majesty's Government in the United Kingdom of Great Britain and Northern Ireland Represented by the Ministry of Defence (1970 MOU), April 1, 1970,

annexed to *Defendant's Motion for Partial Dismissal (Defendant's Motion)* as Exhibit (Ex.) 14A.

3. The Florida District Court action also involves a second patent, U.S. Reissue Patent No. 26,887, allegedly owned by William B. McLean and Walter G. Finch, co-plaintiffs with Hughes in that action, and exclusively licensed to Hughes. *Defendant's Motion*, at 5, and Ex. 3; *Plaintiff's Response to Defendant's Motion for Partial Dismissal (Plaintiff's Response)*, at 1–2. Both patents were allegedly infringed in the production of the Skynet II F1 and F2 satellites, launched by the U.S. Government on January 19, 1974 (unsuccessfully), and November 22, 1974, respectively. The F1 satellite was fabri-

against the Philco-Ford Corp. and Marconi Co., Ltd. of Great Britain, in the U.S. District Court for the Middle District of Florida (Orlando Division), Civil Action No. 74–21–Orl–Civ–R. Defendants in that action moved for dismissal on the ground, *inter alia*, that plaintiff's claims involving the Skynet II program should have been brought in this court pursuant to 28 U.S.C. § 1498(a). By an order entered October 8, 1974, the district court denied defendants' motions but stayed further proceedings pending this court's determination in this case of the scope of our jurisdiction. Although not conceding the jurisdictional issue, plaintiff has taken the position that defendants' motions raise procedural rather than substantive issues so far as plaintiff's interests are concerned. Therefore, plaintiff has elected not to oppose defendant's motion.[4] Since the affidavits and exhibits submitted in support of defendant's motion present for our consideration numerous matters outside the pleadings, we treat this motion as one for partial summary judgment. Ct.Cl. Rule 38(c); *Moore-McCormack Lines v. United States*, 413 F.2d 568, 570 n. 1, 188 Ct.Cl. 644, 648 n. 1 (1969).

After long and careful consideration, we have concluded, for the reasons set forth below, that (1) plaintiff's patented invention was used and manufactured by and for the United States within the meaning of 28 U.S.C. § 1498(a); (2) plaintiff's claim is not dependent upon the 1970 MOU within the meaning of 28 U.S.C. § 1502; (3) Skynet II was an appropriated fund activity within the meaning of 28 U.S.C. § 2517; and (4) jurisdiction of infringement claims incident to foreign military sales was not eliminated by the omission of a provision therefor in the 1968 FMSA. Accordingly, we hold that plaintiff's claim lies properly within the intended and settled parameters of this court's jurisdiction under 28 U.S.C. § 1498(a), and that defendant's motion for partial summary judgment should therefore be denied.

I

### Factual Background

The facts essential to our decision in this case, although complex, are not in dispute:[5]

### A. The Skynet II Program

The Skynet II system, a product of cooperative defense efforts of the U.S. and the U.K., is primarily utilized by the British Ministry of Defence to provide reliable satellite communication between permanent and mobile British military installations on a segment of the earth (the U.K. segment) extending from the U.K. in the west to Singapore and western Australia in the east. The first Skynet spacecraft, Skynet I, was fabricated and tested in the United States by Philco-Ford Corp., and is presently in a geostationary, synchronous orbit[6]

cated in Great Britain by Marconi as prime contractor with the United Kingdom Government, using components manufactured and exported there by Philo-Ford as subcontractor. *Defendant's Motion*, at 5–6, and Ex. 3.

**4.** The Government's motion seeks only partial dismissal because plaintiff's petition alleges, albeit somewhat obliquely, that the Government's infringement also extended to acts undertaken outside the Skynet II program. Although the Justice Department denied the Department of the Air Force permission to appear as amicus curiae in this proceeding, the Air Force position, in support of this court's jurisdiction of the case, is set forth in a memorandum annexed to *Defendant's Motion* as Appendix B thereof (Air Force Statement).

**5.** These facts are substantially derived from *Defendant's Motion*, at 14–30, and Exhibits 11 through 15 thereof. Exhibits 11, 12, and 13,

originally submitted by Marconi in support of its motion to dismiss the Florida district court action, comprise affidavits of Sidney Dobb, Marconi's Assistant Managing Director (Ex. 11); of F. W. Jackson, Marconi's Spacecraft Division Manager (Ex. 12); and of Robert A. W. Baker, Director of Contracts in the Procurement Executive, U.K. Ministry of Defence (Ex. 13), respectively. Exhibits 14 and 15 consist of affidavits of L. K. Moseman II, Deputy Assistant Secretary (Logistics), Department of the Air Force, U.S. Department of Defense (Ex. 14), and of Robert J. Goss, Mission Analysis and Integration Branch Chief (Delta Project), Goddard Space Flight Center, NASA (Ex. 15), respectively.

**6.** A "synchronous orbit" is one wherein the satellite requires 24 hours to circle the earth, so that it remains stationary over a given geographical location on earth.

above the Indian Ocean, at the center of the U.K. segment, controlled by the U.K. Telemetry Command Station at RAF Oakhanger, Hampshire, England, and used by nine U.K. earth stations throughout the U.K. segment.

The objectives of the U.S. and the U.K. Governments in the Skynet II program, undertaken to replace Skynet I, are partially set forth in the 1970 MOU.[7] According to the MOU, the U.S. Government was then proceeding to develop a second phase of its own defense satellite communications system (DSCS Phase II), while the U.K. Government also had a continuing operational requirement for defense satellite communications. It was therefore a long-term cooperative aim of the two Governments to introduce equipment with interoperable characteristics so that earth stations, whether U.S. or U.K., would be inherently capable of direct communications through U.S. DSCS satellites or U.K. satellites.[8] The U.K. Skynet Phase II satellites were in fact to comprise the U.K. segment of the U.S. defense satellite communications system. This cooperation was to continue until such time as the United States Government was in a position to offer communication facilities to the U.K. in U.S. DSCS satellites situated over the Indian Ocean area.

Under the 1970 MOU, the U.K. Government was to procure its Skynet II satellites from a British prime contractor who would, in turn, be permitted to make use of U.S. subcontractors with the approval of the U.S. Government. The U.S. further agreed to grant the U.K. and its contractors the use of such technical information, design rights, patent rights and licenses vested in the U.S. Government as may be legally permissible, and to assist the U.K. in obtaining additional rights where necessary. Launch vehicles were to be procured by the U.S. on behalf of the U.K., and the U.S.

agreed to launch the satellites into orbit using U.S. launching and satellite control facilities. Costs incurred by the U.S. on behalf of the U.K. were to be paid from a trust fund consisting of sums deposited therein by the U.K. with charges based on work performed in connection with the launch vehicles and services, the satellites, packing and transportation, and administrative services.

Following the launch and final positioning in earth orbit, the U.K. was to have sole communications and operational control over the Skynet II satellites, including attitude control, station-keeping and other command functions exercised by the U.K. ground control station at RAF Oakhanger, Hampshire, England. In the event of an emergency, however, the U.S. could assume operational control if so required by the U.K. Each Government was to provide the communications and control earth stations required for its own use.

The Patent Liability Section I of the 1970 MOU provided that each Government would follow its normal procurement practices in securing all rights considered essential for the program, including the procurement of material, services, documents and information to meet the special requirements of the other Government. Were such procurement to give rise to patent infringement claims or suits, any payments made by one Government in consequence thereof were to be repaid by the other Government. No claims were to be settled, however, without prior consultation with and agreement of the other Government.

## B. *Plaintiff's Patent*

That part of the Skynet II system accused of infringing plaintiff's patent was designed to control the attitude or orientation of a spin-stabilizied, military communications spacecraft while circling the earth

---

7. *See* note 2 *supra*.

8. This cooperative aim has been continued by means of another classified agreement, effective Jan. 30, 1975, entitled "Memorandum of Understanding Concerning the Shared Use of the US DSCS Phase II Satellites Over the Atlantic and West Pacific Oceans and the UK Skynet II Satellite to Meet US and UK Interoperability Requirements." Ex. 16, Attachment 16A; *Defendant's Motion*, at 19.

in a synchronous orbit. The Skynet II spacecraft had a generally cylindrical body in which were mounted a number of subsystems, including communications, telemetry, tracking and command, reaction control equipment, and attitude and orbit control. The last of these subsystems is alleged to have made use of plaintiff's patent in the following manner: The principal communications radio antenna of the spacecraft was designed to lie on the cylindrical body's central axis, or "spin" axis, and solar cells were arrayed on the outer surface of the cylindrical body. To obtain optimum antenna gain and solar cell illumination (i. e., in order to charge the spacecraft's batteries), it was important that the "spin" axis of the spacecraft be properly oriented with respect to the earth and sun while the spacecraft was in orbit. It was the intended function of the accused control subsystem to achieve and maintain such proper spacecraft orientation. To this end, the control subsystem included means for sensing the spacecraft's orientation with respect to the earth and sun, and for transmitting such data to a ground command station which, after analysis thereof, would in turn transmit commands back to the spacecraft's attitude control, thereby causing one or more of the spacecraft's hydrazine thrust motors (or thrusters) to fire for a predetermined period so as to correct or adjust the spacecraft's attitude or orientation.

### C. *United Kingdom Involvement*

On July 30, 1970, the U.K. Ministry of Defence (then the Ministry of Technology) contracted with the General Electric Co., Ltd. of Great Britain (GEC) to develop and supply the Skynet II spacecraft. The contract included a provision that title to the Skynet II spacecraft would vest in and become the absolute property of the Ministry of Defence as the spacecraft was constructed. Subsequently, all work on the Skynet II project was transferred to the Marconi Co., Ltd.[9] Fabrication of the spacecraft was conducted chiefly at Marconi's Applied Electronics Laboratories at Portsmouth, England.

In order to obtain certain components and other assistance necessary for the satellite's design and assembly, including solar panels, earth and sun sensors, nutation dampers, communication antenna, S-band antenna, S-band radio equipment, traveling wave tube amplifiers, thruster motors and hydrazine storage tanks, Marconi entered into subcontracts with a U.S. corporation, Philco-Ford. These components were thereafter shipped to England and incorporated into the satellite by Marconi.

After fabrication and testing by Marconi, the satellite was subjected to additional acceptance tests at Portsmouth, England, by the Ministry of Defence, during May through December 9, 1973. On December 11, 1973, the Ministry of Defence shipped the satellite via a Royal Air Force plane, from England to the United States Air Force Eastern Test Range (ETR) at the John F. Kennedy Space Center, Cape Canaveral, Florida. After arrival, the satellite was uncrated and subjected to further tests to check the integrity and compatibility of its electrical circuits and components. It is unclear whether the accused control system was, during this period, operated or used in the manner it was intended to be operated or used when the satellite was in orbit. No spinning of the satellite occurred, for example, and the hydrazine thrust motors were not fired and could not have been fired for safety reasons. After components testing, the satellite, together with the apogee boost motor, was mated to the third stage of a Thor-Delta booster provided by the National Aeronautics and Space Administration (NASA). The stage was then mechanically mated to a NASA Thor-Delta booster vehicle on the launch pad.

### D. *U.S. Involvement*

U.S. responsibilities under the 1970 MOU generally entailed assisting the U.K. in the

---

**9.** The Marconi Co., Ltd., is a subsidiary of the English Electric Co., Ltd. which, in turn, is a subsidiary of GEC. Ex, 11, para. 2.

design, development, procurement, launch and initial orbital support of its satellites, and the modification of U.K.'s ground Telemetry Command Station (TCS) at Oakhanger, England. Essentially, the U.S. provided (1) technical interface to ensure that the U.K.-procured satellites would be compatible with the U.S.-procured launch vehicles; (2) cryptographic equipment and training; (3) testing of certain elements of the Skynet II satellite; (4) two launch vehicles and launch support; and (5) orbital support.

The foregoing United States activities were implemented by the Space and Missile Systems Organization of the U.S. Air Force (USAF/SAMSO) through procedures of the Foreign Military Sales Act (FMSA), 22 U.S.C. §§ 2751–94. In effect, the U.S. Government, as represented by the USAF/SAMSO, agreed to sell certain defense articles and services to the U.K. on a "dependable undertaking" cash basis for use in connection with the Skynet II program. This was accomplished by means of a series of sales agreements, called FMS cases, whereby specific U.S. offers of sale were duly accepted by the U.K. Pursuant to the U.S. Government's obligations under these FMS cases, the USAF/SAMSO performed the following activities: (1) Management and administration of certain Skynet II program activities as outlined in Section E of the 1970 MOU, (2) arrangements and/or authorizations for other USAF organizations to perform such Skynet II functions as apogee kick motor testing, launch/range support, and orbital support, (3) awards of USAF/SAMSO contracts to U.S. business concerns for various services, and (4) arrangements with NASA to provide Delta-type vehicles for launch of the satellite into synchronous equatorial orbits.

The different sections of the Delta launch vehicles used for Skynet II were procured by NASA under its own contracts with various U.S. companies. There was no NASA in-house manufacture, research or development specifically associated with the Skynet II program. Nor was NASA involved in the acquisition of the satellites themselves, although it did provide limited support for satellite ground checkout before launch. Thus, NASA's direct involvement with each Skynet II satellite was limited to the period from checkout and mating of the satellite to the Delta launch vehicle on the ground, to the time that the satellite separated from the launch vehicle while in transfer orbit. At this latter point, SAMSO was to initiate tracking and command of the satellite for the purpose of placing it in final synchronous orbit. NASA's Skynet II activities, including its outside procurement of Delta launch vehicles and support services, and its office overhead, were fully reimbursed by the Air Force under the terms of a May 1, 1972, agreement.

On January 19, 1974, the U.S. Government, acting through NASA and the U.S. Air Force, launched the first Skynet II F1 satellite from the Air Force ETR. The launch was under the exclusive direction of the U.S. Government, and control and operation of the satellite itself was not scheduled to be transferred to the U.K. until some 28 days after launch. The Skynet II F1 launch, however, was unsuccessful, the satellite was not injected into the proper transfer orbit by the NASA Thor-Delta booster and, several days after launch, the satellite was presumed destroyed by heat generated as a result of its contact with the earth's atmosphere.

The second Skynet II F2 satellite, launched by NASA on November 22, 1974, from the Air Force ETR, achieved its proper transfer orbit and, thereafter, the Air Force Satellite Control Facility (SCF) in Sunnyvale, California, and its remote tracking stations, tracked and commanded the satellite during a 26-day post-launch period in order to place it into its final synchronous orbit station over the Indian Ocean. During this period, the SCF received telemetry data from the satellite, computed commands for attitude maneuvers, and transmitted such commands to the satellite in order to change its attitude or orientation. Once situated in its final station over the Indian Ocean, all control over the satellite

(including attitude control) was transferred, on December 18, 1974, from the Air Force to the U.K. Government.

All U.S. Government activities under the Skynet II program, including personnel expenses, were ultimately funded in the same manner as other standard foreign military cash sales by the Department of Defense, which are at no cost to the United States. As earlier described, the Skynet II FMS cases were cash sale dependable undertakings (DD Form 1513, Letter of Offer), signed by the U.S. and the U.K. Governments, which established the funding authorization and included the applicable 2-percent administrative surcharge. The USAF subsequently provided articles and services using "reimbursable budget authorization," and its expenditures and the reimbursements thereof were conducted during the 4-year period through the standard FMS trust fund deposit arrangement. All Air Force funds used were appropriated funds which were subsequently reimbursed with United Kingdom funds. No non-appropriated USAF funds were used at any time.

Plaintiff Hughes filed its petition in this court, pursuant to 28 U.S.C. § 1498(a), on November 13, 1973, approximately 2 months prior to the first, unsuccessful launch of the Skynet II F1 satellite. Plaintiff's First Amended and Supplemental Petition, covering the Skynet II F1 launch, was filed on November 19, 1974, 3 days before the successful launch of Skynet II F2. A Second Supplemental Petition covering U.S. Government involvement in the Skynet II F2 project, was filed August 8, 1975. Defendant filed answers to plaintiff's original and amended petitions on May 13, 1974, and September 4, 1975, respectively. On July 18, 1975, defendant filed the instant motion for partial dismissal. Plaintiff filed a response on August 22, 1975, and the case was orally argued by defendant on January 6, 1976.

II

*28 U.S.C. § 1498(a): Basic Patent Jurisdiction*

By its express terms, 28 U.S.C. § 1498(a) vests exclusive jurisdiction in this court over patent infringement claims against the Government arising upon either one or both of the following two grounds: (1) unlicensed use or manufacture of a patented invention by the U.S. directly; and/or (2) unlicensed use or manufacture of a patented invention *for the U.S.* and *with its authorization or consent.*

Defendant contends that neither of these two grounds is present in the instant case, for the reasons, most simply stated, that (1) any use by the U.S. of plaintiff's patented invention was solely on behalf of and for the benefit of the U.K. Government; and (2) any authorization and consent by the U.S. Defense Department was given extra-contractually and only after this litigation against the Government had already been commenced, exceeded that Department's authority, and was therefore of no legal effect. We disagree with both of these contentions. Since they involve separate questions of law and fact, in the interest of clarity we consider each contention separately.

### A. Manufacture "for the U.S."

■ The second paragraph of § 1498(a), insofar as it clarifies and construes the meaning of the phrase "use or manufacture * * * for" the U.S., contained in the first paragraph thereof, sets forth a two-part test for determining whether this court has jurisdiction in the first instance [10] over a particular claim. Under this test, a finding of jurisdiction is conditioned upon a showing that (1) the accused use or manufacture was undertaken *for the Government,* i. e., for the Government's benefit;

---

**10.** We use the phrase "in the first instance" to suggest that, even where § 1498 jurisdiction is otherwise established, such jurisdiction may nonetheless be precluded were we to find, as defendant argues in the instant case, that plain-

tiff's claim is dependent upon a treaty within the meaning of 28 U.S.C. § 1502, or involves non-appropriated fund activities within the meaning of 28 U.S.C. § 2517.

and (2) the Government gave its *authorization or consent* for the accused use or manufacture.

 Those aspects of this case relating to "manufacture for" the U.S. concern the manufacture of the F1 and F2 satellites by, among others, the Philco-Ford Corp. and the Marconi Co. under contracts with the U.K. Government, for ultimate use in the Skynet II program. Thus, the first inquiry under § 1498(a), as above described, is whether the Skynet II program and the satellites manufactured pursuant thereto were for the benefit of the U.S. Government. We answer this question in the affirmative.

Defendant's affidavits and exhibits show that Skynet II was intended by the U.S. and U.K. Governments to be a cooperative program, vital to the military defense and security of both countries, and directed toward the replacement of the Skynet I satellites which formed the U.K. segment of the U.S. Defense Satellite Communications System (DSCS). According to the 1970 MOU, which created and implemented the program, one of its principal aims was to ensure the interoperability and shared use of U.S. and U.K. satellites so that each country could effectively augment its own defense communications capacity by direct and reciprocal utilization of the other country's capacity.[11] As stated by the Department of the Air Force,

> [I]t can be seen that the US involvement in the Skynet II program cannot be viewed as a mere sale of satellite launch services by an uninterested party. Rather, the furnishing of the launch equipment and services was directly related to US National Security as an integral step toward expanding the US defense satellite communications system via the shared use cooperative program set forth in the aforementioned MOU's [Air Force Statement, at para. 14.]

 Clear evidence that Skynet II, consistent with similar defense programs, was undertaken for the direct benefit of the U.S. is found, wholly apart from the 1970 MOU, in the express language of the 1968 FMSA and predecessor acts. Section 1 of the FMSA, 22 U.S.C. § 2751, for example, defines the purpose of the Act in part as follows:

> The Congress recognizes, * * * that the United States and other free and independent countries continue to have valid requirements for effective and *mutually beneficial defense relationships* in order to maintain * * * international peace and security * * * The need for *international defense cooperation among the United States and those friendly countries to which it is allied by mutual defense treaties is especially important, since the effectiveness of their armed forces to act in concert * * * is directly related to the operational compatibility of their defense equipment.*
>
> Accordingly, *it remains the policy of the United States to facilitate the common defense* by entering into international arrangements with friendly countries which further the objective of applying agreed resources of each country to programs and projects of cooperative exchange of data, research, development, production, procurement, and logistics

---

11. The 1975 MOU, unclassified portions of which were annexed to defendant's motion as Attachment 16A to Ex. 16, *see* note 8 *supra,* also recognizes that the U.S. and U.K. "each [has] a requirement for and desire to achieve interoperable satellite communication links over the satellites of either the USG or HMG between certain of each other's specified earth terminals and associated communication facilities." 1975 MOU, para. 10. It also recognizes that each country has "additional requirements for and desire to obtain the allocation of channels in satellite links between certain specified UK earth terminals and between certain speci-

fied US earth terminals, respectively." 1975 MOU, para. 11. To meet these requirements and desires, the agreement provides that "[e]ach nation will be able to achieve a greater communications coverage and be able to develop communication systems which will be more flexible than could otherwise be realized." 1975 MOU, Sec. A, para. 1. In addition, "[t]he use by the USG of satellite capacity and ground communications facilities made available by HMG under this agreement will be only for those unique and vital communications associated with *US National Security requirements.*" (Emphasis added.) 1975 MOU, Sec. A, para. 2.

support *to achieve specific national defense requirements and objectives of mutual concern. To this end, this chapter authorizes sales by the United States Government to friendly countries * * * in furtherance of the security objectives of the United States * * * .* (Emphasis added.)

*See also* §§ 2 and 3(a) of the 1968 FMSA, 82 Stat. 1322, *as amended* 22 U.S.C. §§ 2752 and 2753(a). Moreover, as more fully discussed in Part V of this opinion, *infra,* each act since 1951 included a special provision vesting jurisdiction in this court or the appropriate district court of any patent infringement claims arising in connection with the Government's foreign military sales and assistance activities. *See* Foreign Assistance Act of 1961, § 606, 75 Stat. 440, 22 U.S.C. § 2356; Mutual Security Act of 1954, § 506, 68 Stat. 852; Mutual Security Act of 1951, § 517, 65 Stat. 382. The purpose of this provision was to remove any doubt that such activities were *for the U.S.* within the meaning of 28 U.S.C. § 1498 and that, hence, the principles of § 1498 were fully applicable to mutual security/foreign military assistance procurement on the part of the Government. *See* S.Rep. No. 612, 87th Cong., 1st Sess. 30 (1961); H.Rep. No. 851, 87th Cong., 1st Sess. 66–67 (1961); U.S. Code Cong. & Admin.News 1961, p. 2472; H.Rep. No. 1925, 83d Cong., 2d Sess. 95 (1954); H.Rep. No. 872, 82d Cong., 1st Sess. 57 (1951); *Hearings on H.R. 5020 and H.R. 5113 Before the House Committee on Foreign Affairs,* 82d Cong., 1st Sess., at 1420 (1951); *Kaplan v. United States,* 153 F.Supp. 787, 788–89, 139 Ct.Cl. 682, 685–87 (1957); Pasley & TeSelle, *Patent Rights and Technical Information in the Military Assistance Program,* 29 Law & Contemp. Prob. 566, 576 (1964). Since we conclude, in Part V of this opinion, that this special jurisdictional provision is still in force, notwithstanding Congress' failure to expressly incorporate it into the 1968 FMSA, it follows that Skynet II, as implemented by that Act, was *for the U.S.* within the meaning of 28 U.S.C. § 1498(a). Under these circumstances, we have little difficulty concluding that the Skynet II program was undertaken as much for the benefit of the U.S. as for the U.K.

The second and more difficult question under § 1498(a), however, is whether the Government gave its authorization and consent for any infringements which might occur under the Skynet II program. In the Florida District Court action,[12] defendants Philco-Ford and Marconi moved to dismiss on the ground, *inter alia,* that the U.S. Defense Department, in correspondence [13] transmitted to the U.K. Ministry of Defence in July 1974, had given the Government's express authorization and consent to such infringement, thereby bringing the case within this court's exclusive jurisdiction. This letter of authorization and consent (the Reed clause), prompted by an official request of the U.K. Government,[14] stated that:

[T]he Skynet II Program is a joint effort by the USG and HMG for the mutual benefit of both governments pursuant to the cooperative agreement under the 1970 MOU * * * . [As the Marconi Co.'s services concerning Skynet II F2 under contract with HMG] are similar to those performed by Marconi on Skynet II F1 and since these services apparently comprise part of Hughes complaint in Civil Action 74–21 [Florida District Court], it is conceivable that Hughes may file a like complaint against Marconi to enjoin its performance of these services

12. *See* note 3 *supra* and accompanying text.

13. The statement of authorization and consent is set forth in a letter, dated July 19, 1974, from Thomas C. Reed, Director, Telecommunications and Command and Control Systems, Office of the U.S. Secretary of Defense, to Dr. D. G. Kiely, Director General, Telecommunications Procurement Executive, U.K. Ministry of Defence.

14. Letter dated May 21, 1974, from Mr. J. G. Lewis, Deputy Head, Defense Reserve and Development Staff, British Embassy, Washington, to Mr. David L. Solomon, Deputy Assistant Secretary (Operations and Engineering), Office of the U.S. Secretary of Defense.

on Skynet II F2. Because Marconi's services are a necessary step prior to the launch conducted by the USG, such an injunction would effectively enjoin indefinitely the United States Government from performing its satellite launch obligations under the MOU and interrupt a USG national defense oriented program. *Thus, although Marconi is under an express contract with HMG, its services are also considered to be "for" the USG via the cooperative program established by the MOU, bringing these services within the eminent domain provisions of 28 U.S.C. 1498(a).*

\* \* \* \* \* \*

In view of the foregoing, and in the spirit of Section I of the MOU requiring each Government to " \* \* \* follow its normal procurement practices in securing all rights it considers essential for the purposes of this MOU, including the procurement of \* \* \* services \* \* \* to meet the special requirements of the other Government \* \* \* " *the United States Government hereby gives its authorization and consent, without prejudice to any rights of indemnification, for all use and manufacture of any invention described in and covered by the U.S. Patent Numbers 3,758,051 and Re-issue 26,-887, in the performance of the obligations of HMG under the MOU and in the performance of the obligations of the Marconi Company under its contract by HMG for services to be performed in this country relative to the Skynet II F2 satellite prior to its launch.* (Emphasis added.)

In response to a subsequent letter from the U.K. Defence Ministry, dated July 26, 1974, inquiring whether the Government's consent was intended to have retroactive effect so as to include prior activities relating to Skynet II F1, Mr. Reed, acting for the Defense Department, stated that:

[T]he U.S. is pleased to inform you that the authorization and consent contained in the last paragraph of my letter of July 19, 1974, shall apply respectively to SKYNET II F1.

■ The Department of Justice has vigorously contended, both in its brief and at oral argument, that the foregoing correspondence exceeds the Defense Department's authority and can have no legally operative effect for several reasons. First, a Government official cannot confer jurisdiction upon a Federal court which such court has not otherwise been authorized by statute to exercise. *Huther v. United States,* 145 F.Supp. 916, 918, 136 Ct.Cl. 655, 659 (1956). Nor may lack of jurisdiction be waived or overcome by agreement of the parties, *Rolls-Royce, Ltd. v. United States,* 364 F.2d 415, 420, 176 Ct.Cl. 694, 702 (1966), or by stipulation of a Government attorney. *Otis Elevator Co. v. United States,* 18 F.Supp. 87, 89 (S.D.N.Y.1937). These principles, albeit correct, are not to the point. This is not a case wherein a Government official has purported to confer jurisdiction on this court which we are not otherwise authorized by statute to exercise. As earlier discussed, § 1498(a) plainly authorizes jurisdiction in this court over infringement claims involving manufacture by a contractor for the Government and with the Government's authorization or consent.

■ Nor is this a case wherein the parties are seeking, by waiver, agreement, or stipulation, to overcome a lack of jurisdiction. On the contrary, the Reed clause, in our view, constitutes the clear functional equivalent of the standard blanket authorization and consent clause utilized in regular defense contracts pursuant to Part 9 of the Armed Services Procurement Regulations (ASPR).[15] To fall within the ambit of the ASPR clause, just as to fall within the ambit of the Reed clause involved in this case, the accused manufacture need only have occurred in the performance of the contract or, as here, the Skynet II program. Indeed, the stated purpose for the Reed

---

**15.** The ASPR clause reads as follows:

"The Government hereby gives its authorization and consent for all use and manufacture of any [patented] invention \* \* \* in the performance of this contract or any part hereof or any amendment hereto or any subcontract hereunder. \* \* \* " ASPR § 9–102.2, 32 C.F.R. § 9.102–2.

clause, as well as the purpose for inserting such clauses in defense contracts generally, comports with the broad purpose and policy of § 1498(a) to cloak with immunity from injunction certain types of activity deemed vital to U.S. interests or objectives. *See Carrier Corp. v. United States,* Ct.Cl., 534 F.2d 244 at 248 (Decided Jan. 28, 1976); *Richmond Screw Anchor Co. v. United States,* 275 U.S. 331, 342–43, 345, 48 S.Ct. 194, 196–197, 72 L.Ed. 303, 307–308 (1928); *Bereslavsky v. Esso Standard Oil Co.,* 175 F.2d 148, 150 (4th Cir. 1949).

 Nor, finally, is there any requirement that authorization or consent necessarily appear on the face of a particular contract.[16] On the contrary, " 'authorization or consent' on the part of the Government may be given in many ways other than by letter or other direct form of communication"—e. g., by contracting officer instructions, by specifications or drawings which impliedly sanction and necessitate infringement, by *post hoc* intervention of the Government in pending infringement litigation against individual contractors. II *Bulletin of the Judge Advocate General* 75 (1943), SPJGP 1943/881 (Feb. 8, 1943); *see Molinaro v. Watkins-Johnson CEI Div.,* 359 F.Supp. 467, 470–71 (D.Md.1973); *Bereslavsky v. Esso Standard Oil Co., supra,* 175 F.2d at 151. Indeed, the cases wherein the Government has intervened to proffer retroactive consent and have the action transferred to this court, *see, e. g., Roberts v. Herbert Cooper Co.,* 236 F.Supp. 428 (M.D. Pa.1959), provide the nearest analogue to the situation we confront in the instant case.

 We also can find no merit in the Justice Department's final reason for contesting the validity of the Reed clause, i. e.,

that the Defense Department lacked authority to act for the Government after the Hughes litigation had already been commenced. Certainly, there can be no dispute that, unless otherwise provided by law, the Attorney General is charged by statute with exclusive and plenary power to supervise and conduct all litigation to which the U.S. is a party. 28 U.S.C. §§ 516–20; *see S & E Contractors, Inc. v. United States,* 406 U.S. 1, 12–15, 92 S.Ct. 1411, 1418, 31 L.Ed.2d 658, 667–669 (1971); *Case v. Bowles,* 327 U.S. 92, 96–97, 66 S.Ct. 438, 440–441, 90 L.Ed. 552, 556–557 (1946). Indeed, it was on the basis of this power that the Department of Justice denied the request of the Department of the Air Force to appear as amicus curiae in this case. This power, however, because so broadly inclusive, must be narrowly construed. *United States v. Daniel, Urbahn, Seelye and Fuller,* 357 F.Supp. 853, 858 (N.D.Ill.1973). In our view it is limited to the conduct of pending litigation against the Government, and does not encompass exclusive control of other matters which, albeit related, are not yet so pending.

In the instant case, it is plain that the Hughes litigation pending against the Government in this court did not, at the time the Reed letter was transmitted to the U.K. Defence Ministry, encompass claims or matters relating to Skynet II *F2,* but only those relating to F1. Hughes commenced suit in this court on January 17, 1974. The petition, while not specifying F1 *per se,* did not allege, nor could it possibly have alleged, acts of infringement related to the F2 project, since the latter had not begun. The Reed clause was transmitted to the U.K. Government by letter dated July 19, 1974, during the period when progress on

---

**16.** Nor, it must be noted, need the U.S. be a direct party to the contract at issue where, as here, circumstances unquestionably indicate that the U.S. was to be a principal beneficiary thereof. Defendant's reliance on *Yassin v. United States,* 76 F.Supp. 509, 515, 110 Ct.Cl. 211, 221 (1948), in this regard is misplaced. In *Yassin,* plaintiff claimed entitlement to sue the U.S. and certain U.S. contractors therewith for patent infringements by the U.K. Government pursuant to both the Lend-Lease Act and a

wartime patent interchange agreement between the U.S. and the U.K. In that case, decided on a demurrer to plaintiff's petition, the court stated that there was no allegation as to when or where the alleged infringing structures were manufactured and that the only use alleged was one outside the territorial limits of the United States. More importantly, there was no express authorization and consent by the United States for the manufacture of the structures.

F2 was fully underway. In fact, the principal purpose of the U.K. request for such a clause was expressly stated to be the avoidance of any indefinite postponement of the Skynet II F2 project, scheduled for November 22, 1974, launching, by the issuance of an injunction in the Florida District Court proceeding. The Hughes petition in this court, however, was not amended to include acts relating to F2 until August 8, 1975, fully one year following the Reed correspondence. It follows, therefore, that at the time of the Government's authorization and consent regarding the Skynet II F2 project, that project was not yet the subject of pending litigation against the Government of which the Justice Department would necessarily have had exclusive supervision and control.

Since we conclude that the Defense Department—inasmuch as it was specifically charged with coordination of U.S. Skynet II activities, including procurement activities—properly and timely acted within the scope of its authority in giving the Government's authorization and consent, it is unnecessary to address the further question of whether such consent could validly be made retroactive, as the Defense Department intended, so as to include acts of infringement relating to the F1 project. Having found that this court has jurisdiction under the "manufacture for" provision of § 1498(a), we leave such questions to subsequent proceedings to determine the extent, if any, of the Government's liability with respect to its activities pursuant to the Skynet II program generally.

### B. *Use "by the United States"*

 Even if the Government had not given its express authorization and consent, our jurisdiction of the case under the "use by" provision of that section would remain undisturbed. As earlier described, once the Skynet II satellites (both F1 and F2), including the accused orientation control system, were fabricated and delivered by the U.K. Government to the John F. Kennedy Space Center in Cape Canaveral, Florida, the U.S. Government, acting through NASA and the Air Force, assumed full and exclusive control of the project. Thus, from the time of the satellite's delivery in the United States to the time of its separation from the launch vehicle while in transfer orbit, NASA and/or the Air Force assumed sole responsibility for, *inter alia,* testing of the satellite's components and systems, and procurement, testing and mating of the launch motors and vehicles. Thereafter, NASA launched the spacecraft and, following achievement of the proper transfer orbit, the Air Force Satellite Control Facility (SCF) in Sunnyvale, California, assumed sole responsibility for the satellite's tracking and command during the 26-day period preceding F2's positioning into its final synchronous orbit.

In sum, NASA and/or the U.S. Air Force exercised direct and exclusive control of the F1 satellite for approximately 39 days (Dec. 11, 1973–Jan. 19, 1974), and of the F2 satellite for approximate 65 days. Although there is some question as to whether the accused invention was actually used in the manner intended with respect to F1, there would seem but little question that it was so used by the U.S. during at least some part of the 26-day post-launch period with respect to F2. Accordingly, the only possible argument which defendant could raise concerning this court's jurisdiction under the "use by" provision of § 1498(a) is that such use, albeit admittedly direct, exclusive and substantial, was nonetheless made solely on behalf of and for the benefit of the U.K. Since we have already considered and rejected this argument, however, and have found that the Skynet II program was conducted for the direct and mutual benefit of both Governments, we conclude that this court has jurisdiction of the case under 28 U.S.C. § 1498(a). It remains to consider whether our exercise of such jurisdiction, as defendant urges, is nonetheless precluded by virtue of 28 U.S.C. § 1502, 28 U.S.C. § 2517, and/or 22 U.S.C. §§ 2751–94.

### III

*28 U.S.C. § 1502: The Treaty Preclusion*

 Defendant contends, irrespective of § 1498(a), that because plaintiff's

claim arises solely upon the basis of the 1970 MOU between the U.S. and U.K. Governments, implementing the Skynet II program, this court lacks jurisdiction of the case by virtue of 28 U.S.C. § 1502. We disagree. Section 1502 provides that:

> Except as otherwise provided by Act of Congress, the Court of Claims shall not have jurisdiction of any claim against the United States, *growing out of or dependent upon* any treaty entered into with foreign nations. (Emphasis added.)

Whether this section precludes our jurisdiction turns, of course, upon the proper meaning to be accorded the phrase "growing out of or dependent upon" as applied to the facts of the instant case. Unfortunately, defendant, in its brief, does not address this critical issue, but concerns itself, instead, with establishing that (1) the 1970 MOU prescribed the U.S. role in the Skynet II program, and (2) international executive agreements may be considered as treaties for purposes of § 1502. We concur in defendant's latter contention,[17] but regard the former as immaterial. The real issue to be determined for purposes of § 1502 is not, as defendant apparently urges, whether the *Government's* activities were delimited by or dependent upon the 1970 MOU (which would presumably have bearing upon its defense to this action), but whether *plaintiff's claim* so depends. See *S. N. T. Fratelli Gondrand v. United States,* 166 Ct.Cl. 473, 478 (1964). The test under § 1502 is whether plaintiff's claim could conceivably exist independently of, or separate and apart from, the subject treaty, or whether, on the contrary, it derives its existence so exclusively and substantially from certain express terms or provisions thereof, that consideration of the claim would necessitate our construction of the treaty itself. Review of the numerous decisions under § 1502 and predecessor statutes reveals how narrowly the operative phrase "growing out of or dependent upon" has been interpreted.

In *S. N. T. Fratelli Gondrand v. United States, supra,* the most recent case construing § 1502, plaintiff, an Italian corporation, sought compensation for property taken from it during 1942–43 by the U.S. Armed Forces cooperating in the British occupation of Eritrea. Since a threshold question was the effect of the 1947 Italian Peace Treaty, whereby Italy waived its nationals' claims against the U.S. for war-related damage, the Government contended that the court lacked jurisdiction by virtue of § 1502. In rejecting this contention, Judge Davis, writing for the court, stated:

> [W]e think that [§ 1502] does not prevent our deciding whether plaintiff's claim is precluded by the Italian Treaty. *The jurisdictional prohibition applies only to those cases where "the right itself, which the petition makes to be the foundation of the claim, * * [has] its origin—derive[s] its life and existence—from some treaty stipulation."* (Emphasis added.) *United States v. Weld,* 127 U.S. 51, 57 [8 S.Ct. 1000, 32 L.Ed. 62] (1888) * * *. See also, *Great Western Ins. Co. v. United States,* 112 U.S. 193, 197–98 [5 S.Ct. 99, 28 L.Ed. 687] (1884); *Eastern Extension Tel. Co. v. United States,* 231 U.S 326, 333 [34 S.Ct. 57, 58 L.Ed. 250] (1913); *Falcon Dam Constructors v. United States,* 136 Ct.Cl. 358, 364–65, 142 F.Supp. 902, 906–07 (1956); *Societe Anonyme Des Ateliers Brillie Freres v. United States,* 160 Ct.Cl. 192, 196–199 (1963).

> Here, the situation is the reverse. In no direct sense does the plaintiff's claim derive "its life and existence" from the

---

**17.** The 1970 MOU was neither proclaimed by the President, ratified by the Senate, nor submitted for ratification, as required for treaty status pursuant to Article II, Section 2 of the Constitution. Nevertheless, as defendant correctly points out, this court has in the past equated international executive agreements with treaties for purposes of Section 1502. *See Yassin v. United States, supra,* 76 F.Supp. at 517, 110 Ct.Cl. at 225. The reason for this equation is that the fundamental separation-of-powers policy underlying § 1502, i. e., to avoid undue judicial interference (*e. g.,* by construction of particular treaty terms and provisions) with the Executive Branch's conduct of foreign relations, is equally applicable to both forms of international compact. *See Great Western Ins. Co. v. United States,* 112 U.S. 193, 200, 5 S.Ct. 99, 103, 28 L.Ed. 687, 689 (1884).

Treaty; the claim is founded, rather, on the Constitution, the principles governing government contracts under the Tucker Act, and the Rules of Land Warfare. It is the Government which brings the Treaty to the fore as a defense; the claim itself, as distinguished from the defense, neither grows out of nor depends upon the Treaty. We think that 28 U.S.C. § 1502, as its words read and as it has been construed, permits the court to pass upon a treaty issue raised as a defense to a claim which is independent of the treaty. The prohibition is not framed, nor has it been applied, as forbidding this court to construe or apply a treaty. Rather, the statute is a jurisdictional provision directed to the plaintiff's own case and claim, not to the defendant's position. [166 Ct.Cl. at 477–78.]

For § 1502 to be applicable under *Fratelli* and the cases cited therein, that is, for a claim to "grow out of" or be "dependent upon" a treaty, "the *right itself, \* \* the foundation of the claim, must have its origin*—derive its life and existence—*from some treaty stipulation*." *United States v. Weld*, 127 U.S. 51, 57, 8 S.Ct. 1000, 1003, 32 L.Ed. 62, 65 (1888) (Emphasis in original.) This requirement means that the claim involved must not merely be related to or connected with the subject matter of the treaty, but that, absent certain express terms or provisions thereof, there could be no claim at all. The *Weld* case itself, which first clearly articulated this principle, provides an apt demonstration of its application.

*Weld* involved a claim against the Government for the unpaid balance of a judgment rendered in plaintiffs' favor by the Court of Commissioners of Alabama Claims. That court had been specially reconstituted, pursuant to the Act of June 5, 1882, to adjudicate claims of U.S. citizens against the British Government arising from maritime losses inflicted during the Civil War by the Confederate cruisers ALABAMA and FLORIDA, which were built and supplied by the British Government. Funds necessary to satisfy such claims, al-

though drawn directly from congressional appropriations, were initially paid into the U.S. Treasury by the British Government pursuant to the Alabama Claims Treaty (the Treaty of Washington) and the Geneva Award. In affirming the Court of Claims decision and rejecting the Government's contention that plaintiff's claim was barred by § 1066, Rev.Stat. (the predecessor of § 1502), the Supreme Court, in addition to setting forth the principle quoted above, distinguished between a treaty which by its terms creates a specific private cause of action, and a treaty which creates merely a general, intergovernmental compact or arrangement, the subject matter of which may form a part of a cause of action otherwise created by Constitution or statute. As stated by the court:

It may be said in opposition to [our] view of the case that, had there been no treaty of Washington, there would have been no fund \* \* \* to distribute, the act of June 5, 1882 [creating the Court of Commissioners of Alabama Claims], would never have been passed, and therefore that the treaty is the basis of all the subsequent legislation, and consequently the basis of this claim; in other words, that, therefore, this claim is "dependent upon and grows out of" the treaty of Washington.

We are of opinion, however, that such a *dependency upon*, or *growing out of*, is too remote to come within the meaning of section 1066, Rev.St. In our view of the case, the statute contemplates a *direct* and *proximate* connection between the treaty and the claim, in order to bring such claim within the class excluded from the jurisdiction of the court of . claims \* \* \*. 127 U.S. at 57, 8 S.Ct. at 1003, 32 L.Ed. at 65. (Emphasis in original.)

Thus, in *Weld*, the court held that plaintiffs' claim, although occasioned by Great Britain's Alabama Claims Treaty and award of money to the U.S., was not *created* by that treaty, but was *created* by subsequent act of Congress vesting authority to initially determine such claims in a special court of commissioners.

In accord with *Weld's* narrow construction of § 1502 is *Societe Anonyme Des Ateliers Brillie Freres v. United States,* 160 Ct.Cl. 192, 196–99 (1963), also relied on by the court in *Fratelli, supra,* 166 Ct.Cl. at 477. In *Societe Anonyme,* a case factually much closer than *Fratelli* to the instant case, plaintiff, a French corporation, sought to recover settlement funds held by the U.S. pursuant to an escrow agreement and relating to the U.S. use, as licensee, of plaintiff's patents during World War II. Under the agreement, the funds were to be held in escrow pending determination of the applicability of a Memorandum of Understanding between the U.S. and French Governments (the Byrnes-Blum Agreement), whereby France had agreed to pay its nationals' war-related claims against the U.S. The Government contended that the court lacked jurisdiction by virtue of § 1502. In rejecting this contention, the court, in an opinion by Chief Judge Jones, stated:

> [T]he Supreme Court 5 years later [after *Weld*] held that a case *growing out of* a treaty is one involving rights given or protected by a treaty, and is analogous to a case arising under the Constitution or laws of the United States. *United States v. Old Settlers,* 148 U.S. 427, 468–69, 13 S.Ct. 650, 37 L.Ed. 509 (1893). A case arises under the Constitution or laws of the United States whenever its decision depends upon the correct construction of either. [Citation omitted.]
>
> The Byrnes-Blum Agreement has not been drawn into consideration in this case in the manner anticipated by the Supreme Court in the *Old Settlers* case, *supra.* We agree that there is a connection between the Agreement and the suspense account which has been presented to us for construction. Indeed, this case would never have arisen were it not for the existence of the Byrnes-Blum Agreement, because it is that very Agreement that motivated the parties to establish the "escrow" account around which this dispute is centered. Yet that is a far cry from finding that the claim before us "derives its life and existence" from some

treaty stipulation, as the *Weld* case, *supra,* would require. Instead, the substance of plaintiff's claim is derived from the original patent license contract. [160 Ct.Cl. at 197–98.]

The court's reasoning in *Societe Anonyme* is in our view squarely applicable to the instant case. As in *Societe Anonyme,* the instant case, too, "would never have arisen were it not for the existence of" the 1970 MOU, since that agreement implemented the Skynet II program pursuant to which plaintiff's patented inventions were manufactured and used, thereby generating this instant litigation. But that connection is, under the decisions herein discussed, "a far cry from finding that the claim before us 'derives its life and existence' from some treaty stipulation." 160 Ct.Cl. at 197.

We look in vain to the petition and supplements thereto for even a reference to the 1970 MOU. Nor, indeed, would any such reference have been particularly useful, inasmuch as the MOU outlines in only general terms a complex bilateral program whose execution by necessity had to be left to certain delegated agencies and personnel acting pursuant to their own procedures and discretion. Section I of the 1970 MOU, entitled "Patent Liability," the only section directly pertinent here, illustrates this point. Section I states:

1. Each Government will follow its normal procurement practices in securing all rights it considers to be essential for the purposes of this MOU, including the procurement of material, services, documents and information to meet the special requirements of the other Government.

2. Each Government will give the other immediate notice of any claim asserted or suit or action filed hereafter for compensation for unlicensed use of patent rights * * *. No such claims will be settled without prior consultation with, and agreement of, the other Government except under an award by a court of competent jurisdiction.

3. Any payments made by one Government in consequence of any claims, suits or actions arising under paragraph 2 of this Section will be repaid by the other Government.

As can readily be seen, plaintiff's claim does not, nor could it, derive from Section I, since that Section does not purport to create a private cause of action or remedy for any infringements occurring in the course of the Skynet II program. It merely provides, in general terms, for the two Governments' reciprocal indemnity should such claims as might otherwise arise be successfully litigated. In short, the 1970 MOU presents—in the language of *Societe Anonyme, supra,* 160 Ct.Cl. at 198—only a "backdrop" against which the Government's allegedly infringing activities may be more broadly measured.

When properly viewed from the vantage point of the petition, it is clear that plaintiff's claim does not rely on the Government's omission to do anything which it promised to do under the 1970 MOU. In this respect, it is to be distinguished from the contractors' claims in *Falcon Dam Constructors v. United States,* 142 F.Supp. 902, 906, 136 Ct.Cl. 358, 364 (1956), which sought (unsuccessfully, for want of jurisdiction) to hold the Government liable for increased costs resulting from its alleged failure to furnish the drawings, materials and equipment which it promised to furnish plaintiffs under the express terms of its treaty with Mexico (concerning the construction of dams on the Rio Grande River).

In sum, we find plaintiff's claim no more directly or proximately intertwined with the 1970 MOU than was the escrow agreement with the Byrnes-Blum Treaty in *Societe Anonyme,* the Court of Commissioners Act with the Alabama Claims Treaty in *Weld,* or the taking claim with the Italian Peace Treaty in *Fratelli.* Accordingly, we conclude that § 1502 presents no bar to our exercise of jurisdiction in this case.

## IV

### 28 U.S.C § 2517: The Non-Appropriated Fund Preclusion

Defendant next contends that our jurisdiction is precluded on the ground that Skynet II was a non-appropriated fund program. Relying primarily on *Interdent Corp. v. United States,* 488 F.2d 1011, 1012–13, 203 Ct.Cl. 296, 298–99 (1973) and *Kyer v. United States,* 369 F.2d 714, 718, 177 Ct.Cl. 747, 751–52 (1966), cert. den., 387 U.S. 929, 87 S.Ct. 2050, 18 L.Ed.2d 990 (1967), it urges that, since all expenditures made by the U.S. in connection with the Skynet II program were, under the terms of the 1970 MOU, as implemented by the 1968 Foreign Military Sales Act (FMSA), 22 U.S.C. §§ 2751–94, to be fully reimbursed by the U.K., that program was not supported by appropriated funds from which a judgment could properly be paid, as required by 28 U.S.C. § 2517.[18] We do not agree.

The longstanding jurisdictional prohibition of § 2517, as judicially interpreted and developed, derives from two historic and related principles having a direct bearing upon this court's unique jurisdiction. The first such principle is that the doctrine of sovereign immunity precludes suits against the Federal Government unless such immunity has been specifically waived by act of Congress. *United States v. Clarke,* 33 U.S. (8 Pet.) 436, 443, 8 L.Ed. 1000, 1003 (1834); *Hopkins v. United States,* 513 F.2d 1360, 1362, 206 Ct.Cl. 303, 306, *cert. granted,* 423 U.S. 821, 96 S.Ct. 34, 46 L.Ed.2d 38 (1975). The second principle is that before any expenditure of public funds can be made, there must be an act of Congress appropriating the funds and defining the purpose for such appropriation. Thus, no officer of the Federal Government is authorized to pay a debt due from the U.S., whether or not reduced to a judgment, unless an appropriation has been made for that purpose. *Reeside v. Walker,* 52 U.S. (11 How.) 272, 275, 13 L.Ed. 693, 694 (1850).

18. Section 2517, entitled *"Payment of Judgments,"* provides, in pertinent part, as follows:

"(a) Every final judgment rendered by the Court of Claims against the United States shall

be paid out of any general appropriation therefor, on presentation to the General Accounting Office of a certification of the judgment by the clerk and chief judge of the court."

The juncture of these two principles was first recognized by the Supreme Court in *Standard Oil Co. v. Johnson,* 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942), which held unconstitutional the application to Army post exchanges of a state tax on motor fuel distribution. Although military post exchanges "are arms of the Government," nonetheless, the Court stated, "The government assumes none of the financial obligations" of such exchanges. 316 U.S. at 485, 62 S.Ct. at 1170, 86 L.Ed. at 1616. Out of the Court's holding in *Johnson* developed a succession of decisions primarily dealing with military post exchanges, wherein this court held that it lacked jurisdiction of claims against non-appropriated fund activities. *See, e. g., Hopkins v. United States, supra; Manning v. United States,* 200 Ct.Cl. 756 (1973); *Fenton v. United States,* 199 Ct.Cl. 1009 (1972); *Covington v. United States,* 186 Ct.Cl. 960 (1969); *Fermin v. United States,* 184 Ct.Cl. 806, *cert. denied,* 393 U.S. 918, 89 S.Ct. 248, 21 L.Ed.2d 205 (1968).

As previously stated, defendant relies principally upon two decisions similar to those cited above. *Interdent, supra,* involved a claim under § 1498(a) arising from the Government's alleged infringement through the unlicensed sale by military post exchanges of plaintiff's patented oral irrigator. In dismissing plaintiff's claim for lack of jurisdiction, the court held that

> [a]lthough [the post exchanges] are parts of the Federal Government * *, and their operations are carried on by federal officers and employees, their contracts and transactions did not . * * * bind appropriated funds or create a debt of the United States which could be vindicated in this court. The theory has been that, since our judgments are paid only from appropriated funds, in order to be actionable here the transaction sued upon must be one which, in the contemplation of Congress, can obligate public monies. "If Congress has indicated that public funds shall not be involved, we cannot grant the relief requested." *Kyer v. United States, supra,* 369 F.2d [714] at 718, 177 Ct.Cl. [747] at 751–52 (1966). [488 F.2d at 1013, 203 Ct.Cl. at 299.]

Similarly, in *Kyer, supra,* plaintiff, a distilled spirits broker, sued for commissions allegedly earned by securing purchasers for industrial alcohol made from surplus grapes, pursuant to a brokerage contract with the Grape Crush Administrative Committee established by the Secretary of Agriculture under the Agricultural Marketing Agreement Act of 1937, as amended. In dismissing plaintiff's claim, the court held that, although the Act permitted the Secretary of Agriculture, at his discretion, to obligate public funds for the program if necessary, it also created, by express statutory provision, a self-funding scheme whereby, with respect to the Grape Crush Committee, the committee's general expenses could be totally supported by handler (processor or distributor) contributions, and its surplus disposal costs totally financed by producer contributions. Since the Secretary, consistent with congressional intent, determined that the committee could, and in fact it did, operate entirely under this self-funding scheme, without resort to any appropriated funds whatsoever, the court concluded that public funds were never made available to the committee, that the committee was not in any sense authorized to obligate such funds, and that therefore plaintiff's claim could not be satisfied, as required, from any specifically appropriated source. 369 F.2d at 719, 177 Ct.Cl. at 752–53.

Upon careful consideration, we do not believe that either *Interdent* or *Kyer* is controlling here. As distinguished from these cases, which involved entities (i. e., the military post exchanges and the Grape Crush Administrative Committee, respectively) specifically intended to operate without using appropriated funds, the Skynet II program involved in the instant case was from its inception dependent upon, and specifically intended to be dependent upon,

regular appropriated Department of the Air Force/Department of Defense funds.[19]

■ The use of such funds for purposes of the Skynet II program, as defendant's submissions make abundantly clear, was authorized and governed by the 1968 Foreign Military Sales Act (FMSA). Section 21 of that Act, 22 U.S.C. § 2761, provides:

§ 2761. *Cash sales from stock*

The President may sell defense articles from the stocks of the Department of Defense and defense services of the Department of Defense to any friendly country or international organization if such country or international organization agrees to pay not less than the value thereof in United States dollars. Payment shall be made in advance or, as determined by the President to be in the best interests of the United States, *within a reasonable period not to exceed one hundred and twenty days after the delivery of the defense articles or the rendering of the defense services.* (Emphasis added.)

Section 22 of the Act, 82 Stat. 1323, *as amended* 22 U.S.C. § 2762, similarly provides:

§ 2762. *Procurement for cash sales; necessity for dependable* undertaking by foreign country or international organization; availability of appropriations for payments

\* \* \* \* \* \*

(b) The President may, when he determines it to be in the national interest, accept a dependable undertaking of a foreign country or international organiza-

tion with respect to any such sale, *to make full payment within 120 days after delivery of the defense articles or the rendering of the defense services. Appropriations available to the Department of Defense may be used to meet the payments required by the contracts* for the procurement of defense articles and defense services and shall be reimbursed by the amounts subsequently received from the country or international organization to whom articles or services are sold. (Emphasis added.)

Under the foregoing provisions,[20] as implemented by the Air Force Space and Missile Systems Organization (SAMSO), all defense supplies and services procured by the U.S. Government in connection with the Skynet II program were to be provided to the U.K. Government on a "dependable undertaking" cash basis (DD Form 1513, Letter of Offer). This condition of sale was in fact clearly indicated on the face of each individual contract, or FMS case, executed by the two Governments. *See* Exhs. 14F–K. Pursuant to this condition, as expressly prescribed by statute, the U.K. was to pay the U.S. Government whatever was finally determined to be the actual cost of articles or services provided in connection with Skynet II, with such payment to be made either in advance or—as in an admittedly significant number of instances—within 120 days after delivery or performance thereof.

Defendant asserted, during oral argument, that under Section K, paras. 4 and 5 of the 1970 MOU, a trust fund was established, consisting of sums deposited quarter-

---

19. Although NASA also made substantial expenditures in connection with the Skynet II projects, these expenditures were to be fully reimbursed by the Air Force under the terms of their May 1, 1972, agreement. *See* Ex. 15, paras. 2, 8.

20. FMSA procedures are further defined and implemented by the following documents, appended to *Defendant's Motion* as Exhibits 14B through E, respectively: (1) Department of Defense (DoD) Instruction No. 2140.1, dated Jan. 29, 1970, entitled "Pricing of Sales of Defense Articles and Defense Services to Foreign Countries and International Organizations;" (2)DoD Directive No. 2140.2, dated Jan. 23, 1974, enti-

tled "Recovery of Nonrecurring Costs Applicable to Foreign Military Sales (FMS);" (3) Air Force Manual (AFM) 177–112, dated March 8, 1972, entitled "International Accounting Transactions;" and (4) AFM 400–3, dated March 7, 1974, entitled "Foreign Military Sales." Among other things, these documents generally recognize that, where foreign military sales are made on a "dependable undertaking" cash basis, regular DoD appropriations are initially to be used for procurement of supplies and services, with the particular appropriation account to be recredited upon receipt of reimbursement from the customer country.

ly by the U.K. Government and intended to be sufficient to meet all "calls" thereon by the U.S. Government. Whether such "calls" were to be made in advance of or only subsequent to U.S. Skynet II—related expenditures, however, is not articulated in the MOU. In fact, defendant's submissions clearly disclose that this trust fund arrangement was a standard mechanism for effecting Air Force foreign military sales pursuant to §§ 21 and 22 of the FMSA, *supra.* Under this mechanism, sums were to be periodically withdrawn from the particular trust fund account, as administered by the Air Force Accounting and Finance Center (AFAFC), in order to reimburse the appropriate Air Force appropriation account from which FMS expenditures were initially made. As stated at para. 8–2(c) of Air Force Manual 400–3, dated March 7, 1974, and entitled "Foreign Military Sales":

> c. Air Force Reimbursement. *The procurement of most materiel and services for FMS is initially financed by Air Force appropriations.* The consummation of a FMS case provides the Air Force with the obligational authority it requires to furnish the materiel or services involved. The Air Force is repaid upon receipt, by AFAFC, or properly executed Reports of FMS Deliveries and Services Performed * * * or Reports of Progress Payments. * * * The amount of reimbursement to the Air Force will equal the value of these reports, plus appropriate accessorial charges, plus or minus any adjustments from prior billings. *The FMS Central Accounting and Finance Office at AFAFC reimburses the Air Force from Trust Fund Expenditure Account 57–11X8242 * * *.* (Emphasis added.)

Defendant, in effect, admits this much in its brief, wherein it states, quoting from the Affidavit of L. K. Moseman, II Deputy Assistant Secretary (Logistics), Department of the Air Force, that:

[T]hese said Skynet II FMS cases were cash sale dependable undertakings * * signed by the U.S. and U.K. governments, which established the funding authorization and included the applicable two percent Administrative Surcharge. *The USAF subsequently provided the articles and services using "reimbursable budget authorization," and its expenditures and reimbursements were carried out during the four year period through the standard FMS trust fund deposit arrangement. All Air Force funds used were appropriated funds which were reimbursed with U.K. funds. No nonappropriated USAF funds were used at any time.* [*Defendant's Motion*, at 29–30.] (Emphasis added.)[21]

In short, there can be no question that, for purposes of the Skynet II program, regular DoD/AF appropriated funds were intended by Congress to be used, and were so used, in the first instance.

Notwithstanding this fact, defendant argues that the statutory arrangement for full reimbursement by the U.K. of all U.S. costs on the program within 120 days indicates congressional intent to make the program *effectively* self-supporting and that, hence, under our *Interdent* and *Kyer* decisions, this court is without jurisdiction of plaintiff's claim. We cannot agree. As earlier discussed, neither *Interdent* nor *Kyer* involved the use of any appropriated funds. Moreover, certain additional factors may be noted which, in our view, manifest a congressional (and executive) intent with respect to foreign military sales in general, and the Skynet II program in particular, contrary to defendant's position.

First, paragraph 2(b)(4) under Section K of the 1970 MOU, concerning the calculation of charges, states that "[a] fair share of any non-recurring costs for mutually beneficial research, development and production * * *" shall be borne by the U.K.

---

**21.** *See also Defendant's Motion,* at 53–54: "Defendant, of course, recognizes that under the Foreign Military Sales Act certain Defense Department appropriated funds can be used (and in the case of the Skynet II program have been used) for a short period of time until reimbursed by the customer country within 120 days after the delivery of items or the rendering of services in connection with 22 U.S.C. § 2761 and § 2762 cash sales."

Government. Such nonrecurring costs are in fact the subject of a detailed DoD Directive, No. 2140–2, dated January 23, 1974, entitled "Recovery of Non-recurring Costs Applicable to Foreign Military Sales (FMS)." Ex. 14C. The obvious implication of Section K, consistent with other foreign military sales projects covered by the above-mentioned and similar DoD Directives, is that the U.S. Government is also to bear *its* "fair share" of such non-recurring costs out of, in the case of Skynet II, regular (and *non*-reimbursable) DoD/AF appropriations.

Second, paragraphs 2 and 3 under Section I of the 1970 MOU, concerning patent liability (1) require each Government to give the other notice of any pending claims or actions for patent infringement arising from the Skynet II procurement activities of either Government; (2) prohibit settlement of any such action without prior agreement between the two Governments "except under an award by a court of competent jurisdiction;" and (3) provide that "any payments made by one Government in consequence of [any such action] * * * will be repaid by the other Government." It is difficult to imagine language which could more clearly contemplate the Government's potential liability for precisely the sort of infringement suit presently before us. Clearly, the reasonable inference to be derived from this section is that appropriated funds were intended to be available to satisfy judgments rendered in such actions pending ultimate reimbursement by the U.K.

Nor does Section I constitute the only evidence that the Government plainly foresaw, and expressly provided for, the use of appropriated funds in order to satisfy patent infringement judgments rendered as a consequence of its foreign military sales activities. Beginning with the enactment of § 517 of the Mutual Security Act of 1951, 65 Stat. 382, the forerunner of the 1968

FMSA, Congress incorporated into virtually every successor act governing foreign military assistance a special patent infringement jurisdictional provision.[22] *See* Mutual Security Act of 1954, Section 506, 68 Stat. 852; Foreign Assistance Act of 1961, Section 606, 75 Stat. 440, 22 U.S.C. § 2356. The 1951 and 1954 Acts, for example, provided as follows:

(a) As used in this section—

(1) the term "invention" means an invention or discovery covered by a patent issued by the United States; and

\* \* \* \* \* \*

(b) Whenever, in connection with the furnishing of any assistance in furtherance of the purposes of this Act—

(1) use within the United States, without authorization by the owner, shall be made of an invention; * * *

\* \* \* \* \* \*

the exclusive remedy of the owner of such invention or information shall be by suit against the United States in the Court of Claims or in the District Court of the United States * * * for reasonable and entire compensation for unauthorized use or disclosure. * *

We had occasion to consider the import of this provision in *Kaplan v. United States,* 153 F.Supp. 787, 788–90, 139 Ct.Cl. 682, 685–87 (1957). In that case, plaintiff, the owner of patents on certain sleeping bags, alleged that the bags were, without license, manufactured under contracts with the Government and then " 'packed for overseas shipment and use by friendly nations within the language, meaning, and content of the Mutual Security Acts * * * '." 153 F.Supp. at 788, 139 Ct.Cl. at 685. The court rejected plaintiff's claim to the extent that it was based on the Mutual Security Act. However, in interpreting that Act,

---

**22.** Such a provision, however, was omitted, without explanation, from the 1968 FMSA. Defendant argues, on the basis of this omission, that Congress thereby intended to eliminate this court's jurisdiction of patent infringement claims arising in connection with the Government's foreign military sales activities. We disagree with this contention, but defer discussion of it until the final section of this opinion.

the court stated that, where a patented article was produced in the United States by or on behalf of a friendly nation under the Mutual Security Program, it was intended that the United States Government would assume responsibility for any patent infringement which resulted from such use. Also, where United States Government officials disclosed any patented information to a foreign country for their use under the program, the United States would be liable. 153 F.Supp. 787, 139 Ct.Cl. at 687.

Two points are worthy of note here. First, it should be observed that the Government in *Kaplan* did not contend, as it has in the instant case, that this court lacked jurisdiction because the Mutual Security Program was effectively self-supporting. We fail to see any significant difference between the dependable undertaking/reimbursable expenditure arrangement which obtained under the Mutual Security Acts and that which was used for the Skynet II program under the 1968 FMSA.[23] The second and more critical point to be noted is that, under the *Kaplan* court's interpretation of the Mutual Security Act, it is clear that Congress—throughout nearly two decades of experience with U.S. military assistance abroad—consistently foresaw, and attempted by express statutory provisions to avert, the threat of injunctive interruption of such assistance by patent infringement suits brought against the Government in the district courts. Thus, we find it difficult to entertain the notion that Congress, in so acting, also and simultaneously believed the Government to be immune from suit in connection with such foreign military assistance activities on the ground that any U.S. expenditures thereun-

der were to be shortly reimbursed by the foreign governments concerned.

In *Breitbeck v. United States*, 500 F.2d 556, 558, 205 Ct.Cl. 208, 212–13 (1974), a case which we find more closely apposite to the instant case than either *Kyer* or *Interdent, supra*, the Government also contended that this court lacked jurisdiction because the agency there involved, the Saint Lawrence Seaway Development Corporation, was purportedly intended by Congress to be financially self-sufficient. In rejecting the Government's contention and holding that the court had jurisdiction under 28 U.S.C. § 1491 to determine an employee's claim for wages against that corporation, the court observed that "[b]y these provisions [establishing the agency] Congress did attempt to make the agency self-supporting, in general, *in the long run, but there are likewise substantial indications that this was not to separate it wholly from the Treasury.*" 500 F.2d at 559, 205 Ct.Cl. at 212. (Emphasis added.) Instead, the court pointed to various factors which demonstrated the agency's status as an appropriated fund activity, including (1) that its activities were partially financed by long-term revenue bonds which Treasury was required by statute to purchase out of designated Treasury funds; (2) that employee retirement annuities were paid from Treasury moneys, and (3) that it was required to contribute its proportionate share to the civil service retirement and disability fund. As a consequence of such factors, the court concluded that "[t]here is, in short, no such clear cleavage between the Corporation's own funds and those of the United States that one can say that Congress wished to cut the agency entirely loose from the Treasury or from appropriat-

**23.** The legislative history of the 1968 FMSA, 22 U.S.C. §§ 2751–94, indicates that §§ 21 and 22 thereof, 22 U.S.C. §§ 2761 and 2762, which specifically authorize the dependable undertaking/reimbursable expenditure arrangement used for Skynet II, were substantial repetitions of §§ 507(a) and (b) of the 1961 Foreign Assistance Act, Pub.L. No. 87–195, Pt. II, § 507, 75 Stat. 437, with the exception that the 1961 sections authorized up to 3 years, rather than only 120 days, for foreign country reimbursement. *See* S.Rep. No. 1632, 90th Cong., 2d

Sess. 3, 1968 U.S.Code Cong. & Admin.News, p. 4474. Sections 507(a) and (b) of the 1961 Act were, in turn, derived—with changes not pertinent here—from § 106 of the Mutual Security Act of 1954, 68 Stat. 836; § 707(b) and (c) of the Mutual Security Act of 1953, 67 Stat. 160; § 8(b) of the Mutual Security Act of 1952, 66 Stat. 149; § 506 of the Mutual Security Act of 1951, 65 Stat. 379; and § 408(e) of the Mutual Defense Assistance Act of 1949, 63 Stat. 720, respectively.

ed funds." 500 F.2d at 559, 205 Ct.Cl. at 212–13.

In the instant case, as in *Breitbeck*, we find no indication that Congress "wished to cut the Skynet II program entirely loose from the Treasury or from appropriated funds." On the contrary, we have found, here even more clearly than in *Breitbeck*, that Skynet II was directly dependent upon and designed to be dependent upon appropriated funds. While the court, in *Breitbeck*, recognized that Congress intended the Saint Lawrence Seaway Development Corporation to become financially self-supporting "in the long run," it did not regard this long-term objective as jurisdictionally disabling. Unlike *Kyer, supra*, and similar cases involving nonappropriated fund instrumentalities, the agency in *Breitbeck*, as the court found, *was presently dependent upon appropriated funds.*

For purposes of the jurisdictional bar of 28 U.S.C. § 2517, we find no material distinction between *Breitbeck* and the instant case. In both cases, there is no question that regular appropriated funds were required to be used in the first instance. In both cases, there is no question that Congress had specifically given its sanction and support for the agency or program concerned. In short, there exists in neither case any risk of violating the fundamental policy underlying § 2517 by imposing an unauthorized burden on the public treasury. *Interdent v. United States, supra*, 488 F.2d at 1012–13, 203 Ct.Cl. at 298–99; *Kyer v. United States, supra*, 369 F.2d at 718, 177 Ct.Cl. at 751–52.

V

*22 U.S.C. §§ 2751–94: The 1968 Foreign Military Sales Act*

■ Defendant's final contention is that the omission from the 1968 FMSA of the special patent infringement jurisdictional provision contained in predecessor acts manifests congressional intent to eliminate this court's jurisdiction of such claims arising from the Government's foreign military sales activities. We disagree.

The provision at issue, which most recently appeared as § 606 of the Foreign Assistance Act of 1961, Pub.L. 87–195, Pt. III, § 606, 75 Stat. 440, 22 U.S.C. § 2356, reads in pertinent part as follows:

(a) Whenever, in connection with the furnishing of assistance under this Act—

(1) an invention or discovery covered by a patent issued by the United States Government is practiced within the United States without the authorization of the owner, * * *

* * * * * *

the exclusive remedy of the owner, * * * is to sue the United States Government for reasonable and entire compensation for such practice or disclosure in the district court of the United States * * *, or in the Court of Claims * * *.

This provision had earlier appeared, in substantially identical form, as § 506 of the Mutual Security Act of 1954, 68 Stat. 852, and, originally, as § 517 of the Mutual Security Act of 1951, 65 Stat. 382. *See Kaplan v. United States, supra*, 153 F.Supp. at 788–90, 139 Ct.Cl. at 685–87. As explained by the Senate Foreign Relations Committee with reference to the 1961 Act:

This section [606] is a rewrite and simplication, without substantial change, of a provision which has been in the law for many years as section 506 of the Mutual Security Act [of 1954]. It is designed to meet those cases in which patents or information protected by proprietary rights are disclosed by the U.S. Government in connection with furnishing assistance under the bill [S.1983].

In such cases, the aggrieved party may sue the United States either in the Federal court in the district where he resides or in the Court of Claims within a period of 6 years. Provision is also made in subsection (b) for out of court settlements.

S.Rep. No. 612, 87th Cong., 1st Sess. 30 (1961), 1961 U.S.Code Cong. & Admin.News, p. 2501. *See also* H.Rep. No. 851, 87th Cong., 1st Sess. 66–67 (1961).

The purpose for this jurisdictional provision, as successively reenacted, was ex-

plained in the House Report accompanying its original enactment in 1951, as follows:

\* \* \* In effect, the section (517 of the 1951 Act) makes applicable to patents and know-how used in the Mutual Security Program long established principles applicable to privately owned patents used by the United States Government.

This section also affects the use of patents without prior authorization by the owner. *At present, by the Act of June 25, 1910 [28 U.S.C. § 1498], a remedy is provided for a patentee against the United States in the Court of Claims when a patented invention is used for manufacture "by or for the United States." It is important to remove any question as to the availability of this remedy in cases of infringements of United States patents in production for foreign governments. Otherwise, it might be possible for essential production to be stopped by injunction by an unsatisfied inventor.* This section makes it clear that this remedy would be available only so long as the activities concerned form a part of the Mutual Security Program.

\* \* \* \* \* \*

Capt. George N. Robillard, Assistant Chief of Naval Research for Patents and patent counsel for the Navy, and Mr. Casper W. Ooms, consultant to the Secretary of Defense on patent matters, both strongly emphasized the importance of these provisions in supplying our allies with the materials so vital to the effectiveness of this program. It is the desire of the committee that no technicalities be permitted to stop the flow of such materials. (Emphasis added.)

H.Rep. No. 872, 82d Cong., 1st Sess. 57 (1951). *See also* H.Rep. No. 1925, 83d Cong., 2d Sess. 95 (1954).

Captain Robillard, identified in the House Report, *supra*, had testified concerning the patent jurisdictional provision that the "Department of Defense considers it essential that such jurisdiction be vested in the Court of Claims, in order to assure an uninterrupted flow of materials for the purpose of military assistance," because in "many instances, materials for our allies will not be purchased directly by the United States and in the absence of this legislation, a patent owner could enjoin a manufacturer from supplying the materials if patent infringement exists. *Hearings on H.R. 5020 and H.R. 5113 Before the House Committee on Foreign Affairs,* 82d Cong., 1st Sess., at 1420 (1951). Mr. Ooms, also identified in the House Report, had similarly testified that:

In view of the fact that the bill before you provides for assistance to other nations, which may involve procurement directly by them or for them, using United States Government funds, the question immediately arises whether such procurement and the manufacture pursuant thereto, is subject to the normal patent remedies or is subject to the special provisions which have long been effective with respect to manufacture which can be more directly identified with the United States. This section eliminates any such question and merely classifies the activities which this legislation contemplates with manufacture by or for the United States. [*Id.* at 1406.]

The 1968 FMSA contains no patent infringement jurisdictional provision corresponding to § 606 of the 1961 Act. Nor was any reference made to patent rights and Government liability in connection with foreign military sales during the hearings on the Senate version of the act, *Hearings on S. 3092 Before the Senate Committee on Foreign Relations,* 90th Cong., 2d Sess. (1968), or during debate on H.R. 15681 in the House, 114 Cong.Rec. 26214–26320 (1968), and in the Senate. 114 Cong.Rec. 30403–30404 (1968). Section 45 of the FMSA, 82 Stat. 1327–28, 22 U.S.C. § 2751 n., entitled *"Statutes Repealed and Amended,"* makes no mention of § 606 of the 1961 Foreign Assistance Act,[24] 22 U.S.C. § 2356, but provides in pertinent part that:

---

**24.** Sections 45(a) and (b) do, however, expressly repeal §§ 521, 522, 523, 524(b)(3), 634(g) and 640 of the 1961 Act, and amend §§ 622(b), 622(c), 634(d), and 644(m) of that Act, respectively.

(c) * * * Except for the laws specified in section 44 [i. e., the 1954 Atomic Energy Act, and 10 U.S.C. § 7307, relating to the lending of naval vessels to foreign countries], *no other provision of law shall be deemed to apply to this Act unless it refers specifically to this Act or refers generally to sales of defense articles and defense services under any Act.* (Emphasis added.)

Defendant argues, on the basis of this language that, although the patent infringement jurisdictional section (606) of the 1961 Act was not expressly repealed, Congress intended, by omitting that section from the 1968 FMSA, to render it inapplicable to foreign military sales. This is so, according to defendant, because § 606 does not (as § 45(c) of the FMSA would require) "refers generally to sales of defense articles and defense services," but, instead, refers only to "the furnishing of assistance under this Act" which, in its presently amended form (i. e., after extraction of its sales provisions and their incorporation into the separate FMSA), no longer includes the sales program.

 This argument misses the mark inasmuch as it incorrectly assumes that § 606 was qualified and limited by the terms and context of the 1968 Foreign Assistance Act (FAA), 82 Stat. 960–67, *as amended* 22 U.S.C. §§ 2151–2443. This is simply not the case. The 1968 FAA was not intended to wholly supersede the 1961 Act. As the Senate Report makes clear, the purpose of the 1968 FAA was merely to amend and repeal respective provisions of the 1961 Act and to add certain new provisions thereto. S.Rep. No. 1479, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin.News, pp. 3957–59. Nor is § 606 even mentioned in the 1968 FAA or in the legislative history accompanying it. While it is true, as defendant indicates, that the foreign military sales provisions were extracted from the 1961 Act (and consolidated and reenacted as the 1968 FMSA), this change did not alter the original meaning and intent of those provisions of the 1961 Act which, like § 606, were neither amended nor repealed by the 1968 FAA (or the 1968 FMSA). On the contrary, § 606 was codified as 22 U.S.C. § 2356 (1970), and has since remained in full force and effect. Indeed, the note following the text of § 2356 indicates quite clearly that Congress intended that section to have the same meaning and scope it possessed as originally enacted in 1961. The note states that " '[t]his chapter', referred to in the text, was in the original 'this Act', meaning Pub.L. 87–195 [the 1961 Foreign Assistance Act]." Since the 1961 Act makes § 606 applicable to, *inter alia*, foreign military sales, it follows that 22 U.S.C. § 2356 remains so applicable, and therefore satisfies the prerequisite to applicability imposed by § 45(c) of the 1968 FMSA.

Moreover, defendant's argument also ignores the critical fact, amply documented in the legislative history, that § 606 and its predecessor provisions were, from their very inception in 1951, inextricably connected with the gradually expanding foreign military sales program. In view of this fact, it is simply inconceivable to us that Congress, by omitting to expressly incorporate that provision into the 1968 FMSA, thereby intended to render that provision applicable only to non-sale varieties of foreign assistance. Such a wholesale change in the purpose which that provision had served for the preceding two decades would, at the very least, have been mentioned or explained. It follows, *a fortiori,* that more than silence would be required had Congress also intended, by such omission, to narrow the scope of this court's jurisdiction under 28 U.S.C. § 1498(a). We therefore conclude that this court's § 1498(a) jurisdiction is not barred as to claims properly arising from the Government's foreign military sales activities.

## VI

### Conclusion

For the foregoing reasons, we hold that this court has jurisdiction of plaintiff's

claim pursuant to 28 U.S.C. § 1498(a). Accordingly, it is ordered that defendant's motion for partial summary judgment is denied, and the case is remanded to the Trial Division for disposition of the remaining issues of fact and law in accordance with this opinion.